J-S26030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: K.D.T., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: T.Y.B., MOTHER | No. 3376 EDA 2015 |

Appeal from the Decree October 7, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No: CP-51-AP-0000037-2015

| | |
|---|---|
| IN THE INTEREST OF: K.T.B, A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: T.Y.B., MOTHER | No. 3379 EDA 2015 |

Appeal from the Decree October 7, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No: CP-51-AP-0000036-2015

BEFORE:  OLSON, STABILE, and STRASSBURGER,[*] JJ.

MEMORANDUM BY STABILE, J.:                    **FILED MAY 12, 2016**

Appellant, T.Y.B. (Mother), appeals from the October 7, 2015 decrees

involuntarily terminating her parental rights to her daughter, K.D.T., born in

_____

[*] Retired Senior Judge assigned to the Superior Court.

June of 2013, and her son, K.T.B., born in April of 2012 (collectively, the Children).[1]  After careful review, we affirm.

In its opinion pursuant to Pa.R.A.P. 1925(a), the trial court set forth the factual and procedural history of this case, which the record evidence supports.  As such, we adopt the court's recitation as our own.  **See** Trial Court Opinion, 12/7/15, at 1-4.

For purposes of background, we cite the following history of this case:

This [f]amily became known to DHS [Department of Human Services of Philadelphia County] on July 1, 2012, when DHS received [a] General Protective Services ("GPS") report alleging that [K.T.B.] . . . was left unsupervised by his Mother and taken to the hospital where he was diagnosed with a severe dehydration.  Mother's whereabouts remained unknown after several unsuccessful attempts to locate her.  Mother was transient. . . .  Mother had red eyes and allegedly stated to DHS staff that they could take [K.T.B.] with them, if they wanted.  On August 1, 2012, DHS learned that Mother and [K.T.B.] remained transient and had been residing with [K.T.B.]'s maternal aunt and Mother's cousin.  On August 4, 2012, DHS received a GPS [report] alleging that Mother was intoxicated and fighting with her cousin.  The police arrived and it was alleged that Mother broke a window in maternal aunt's home while having [K.T.B.] in her arms.  Due to Mother's injuries, she was hospitalized on August 3, 201[2]. . . .  DHS obtained an Order for Protective Custody ("OPC") for [K.T.B.] and he was placed in foster care through New Foundations. . . .  On October 5, 2012, [K.T.B.] was adjudicated dependent.  Mother was ordered to have a parenting capacity evaluation and was granted weekly supervised visitation at the agency.  Mother was referred to the

---

[1] In addition, by separate decrees on October 7, 2015, the parental rights of D.T., the father of K.D.T., and M.M., the father of K.T.B., were involuntarily terminated.  D.T. filed a notice of appeal, which has not been listed before a panel of this Court to date.  We note that M.M. did not file a notice of appeal. Further, we note that neither D.T. nor M.M. is a party in the instant appeal.

Clinical Evaluation Unit ("CEU") and ordered to follow all of their recommendations. On October 20, 2012, Mother's initial Family Service Plan ("FSP") was developed. Reunification was the goal. Mother's objectives were to participate in a mental health evaluation, drug and alcohol evaluation, to locate and occupy suitable housing, to enroll and attend a General Equivalency Diploma [program], to find employment, and lastly, [to] participate in meetings. Mother was ordered to have a parenting capacity evaluation.

. . . On June [], 2013, Mother gave birth to [K.D.T.] . . . after thirty-five weeks gestation. [K.D.T.] was admitted to the Neonatal Intensive Care Unit. On June 28, 2013, [K.D.T.] was ready to be discharged from the hospital. . . . On th[at] same day, DHS obtained an OPC for [K.D.T.]. . . . [K.D.T.] was adjudicated dependent on July 15, 2013. That same day, the trial court found Mother to be substantially compliant with her FSP. Mother's visits were modified to supervised and to take place at maternal grandmother's home. Mother was also ordered to attend Family School.

Trial Court Opinion, 12/7/15, at 1-2 (citations to record omitted).

On January 21, 2015, DHS filed petitions for the involuntary termination of Mother's parental rights. On October 7, 2015, a hearing on the petitions occurred, during which DHS presented the testimony of William Russell, Ph.D., who performed two parental capacity evaluations on Mother; Ishmael Jimenez, the DHS caseworker; and Dianna Wallace, a social worker at Lutheran Church and Family Services. Mother presented the testimony of Dana Ellis, a Family School social worker; and Mother testified on her own behalf. In addition, D.T., the father of K.D.T., testified on his own behalf.

By decrees dated and entered on October 7, 2015, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Mother timely filed notices of appeal

and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The trial court filed its Rule 1925(a) opinion on December 7, 2015.

On appeal, Mother presents the following three issues for our review:

1. Did the [t]rial judge rule in error that [DHS] [met] its burden of proof that Mother's parental rights to her children should be terminated under 2511(a)(1)[?]

[2.] Did the [t]rial judge rule in error that [DHS] [met] its burden of proof that Mother's parental rights to her children should be terminated under 2511(a)(2), 2511(a)(5)[,] and 2511(a)(8)[?]

[3.] Did the [t]rial judge rule in error that the termination of Mother's parental rights would best serve the needs and welfare of the children[?]

Mother's brief at 2.

We consider Mother's issues mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

This Court need only agree with any one subsection of Section 2511(a), along with Section 2511(b), in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We conclude that the trial court in this case properly terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2), (b).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those

grounds may include acts of refusal as well as incapacity to perform parental duties. **In re A.L.D.** 797 A.2d 326, 337 (Pa. Super. 2002).

Further, this Court has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. **In re A.L.D.**, 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. **Id.** at 340.

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id**. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id.** at 63.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010).

On appeal, Mother argues that the trial court abused its discretion in terminating her parental rights under Section 2511(a) because she complied with her FSP goals and with court orders. The crux of her argument is that

the only FSP goals she did not attain, having adequate income and housing, are not a basis for termination under Section 2511(b), which provides, in relevant part, "[t]he rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S.A. § 2511(b). We conclude that Mother's arguments are without merit.

Mother properly asserts that she completed a CEU evaluation, which determined that she did not need substance abuse intervention. In addition, Mother completed anger management classes, parenting classes, and she was consistent with her mental health treatment. However, upon review, the testimonial evidence demonstrates that Mother has failed to obtain her General Equivalency Diploma and to pursue diligently the services provided for obtaining employment and housing during the history of this case.

Ishmael Jimenez, the DHS caseworker, testified on direct examination that the Achieving Reunification Center (ARC) offered services to Mother with respect to obtaining employment. N.T., 10/7/15, at 43. Specifically, he testified regarding the ARC report dated July 11, 2014, which revealed that Mother was offered a ten-week job training program, but her attendance was not consistent. The report also revealed that Mother ultimately declined to continue addressing her employment goal. *Id.*; DHS Exhibit 26. Mr. Jimenez continued as follows:

[Q.] Did Mom, [at] that time, provide you with the paystub to show that she has employment, that she is gainfully [ ] employed. . .?

[A.] No.

[Q.] Is there any reason that you can imagine why Mom wouldn't be doing an employment assistance. . .?

[A.] No.

N.T., 10/7/15, at 43-44.

Mother testified that she became employed in June of 2015. *Id.* at 145. She works 40 hours per week, which includes three different shifts and "[s]ometimes overnight." *Id.* at 148. She testified on cross-examination by DHS:

[Q.] If you got your Children back right now, where would they go overnight when you were working?

[A.] I have looked up 24-hour day care.

[Q.] And what is the name of it?

[A.] I don't know the name, but it's [in] Germantown.

*Id.* at 148.

With respect to housing, Mother testified on direct examination that she resides in a shelter. *Id.* at 145. Importantly, Mr. Jimenez testified that he made referrals to Mother with respect to obtaining housing. *Id.* at 42. He testified that, "more recently she impressed upon me the need [for housing assistance]. She seemed very urgent about it. I was able to gather a great deal of information . . . that seemed to fall in[to] [the] realm of

being qualified for [obtaining housing]. And I gave her that information over the phone." *Id.*

In addition, Mr. Jimenez testified that, in early 2015, he had a conversation with Mother regarding reunification with the Children. *Id.* at 72. He testified, "[S]he's all along wanted to take on the custody of the children. But I discussed with her the need to have . . . a plan. You have to have an understanding of what you're going to do, how you're going to do it, and the future. But that really hasn't happened." *Id.* Mr. Jimenez continued on direct examination:

> [Q.] If Mom took the kids today and went to live in the shelter, has she identified a daycare that the kids can go to, since she's working full time?
>
> [A.] There was no other plan besides taking the children to the shelter.
>
> [Q.] Has she identified an appropriate resource to help her with these children, since she's working full time and is going to be living in . . . a shelter with them, in her mind[,] right now?
>
> [A.] No.

*Id.* at 72-73.

Finally, Dr. Russell testified that he conducted two forensic evaluations of Mother, one in March of 2013, and the other in April of 2015. N.T., 10/7/15, at 10; DHS Exhibits 8, 27. He acknowledged that, by the time of his second evaluation, Mother appeared "less angry" and "less irritable" than she presented in March of 2013. *Id.* at 26. Nevertheless, Dr. Russell agreed on cross-examination by the Child Advocate that Mother continued to

lack the capacity to provide the Children with safety and permanency. *Id.* at 19.

Based on the foregoing, we conclude that the record evidence supports the involuntary termination of Mother's parental rights pursuant to Section 2511(a)(2). Indeed, Mother's continued incapacity, neglect, or refusal to pursue the services offered to obtain employment and housing have caused K.T.B. and K.D.T. to be without essential parental care, control, or subsistence necessary for their physical or mental well-being since August of 2012, and June of 2013, respectively. Contrary to Mother's argument, we conclude that Mother's inadequate income and/or housing was not beyond her control throughout the length of the Children's placement. In addition, we discern no abuse of discretion by the court in finding that the causes of Mother's incapacity, neglect, or refusal cannot or will not be remedied. Although the record reveals that Mother had employment at the time of the subject proceedings, we deem her employment, obtained in June of 2015, as untimely when K.T.B. has been in placement since he was four months old, and K.D.T. has been in placement since birth. *See In re A.L.D.*, *supra*. Thus, Mother's arguments with respect to Section 2511(a) fail.[2]

In her last issue, Mother argues that the trial court abused its discretion in terminating her parental rights pursuant to Section 2511(b)

_____

[2] Based on this disposition, we need not to review Mother's arguments with respect to Section 2511(a)(1), (5), and (8). *See In re B.L.W.*, *supra*.

because she "had a positive bond" with the Children. Mother relies on the testimony of Dana Ellis, the Family School social worker, who stated that she has observed "positive interactions" between Mother and the Children at the Family School. N.T., 10/7/15, at 134. However, Ms. Ellis testified on direct examination:

> [Q.] [I]s there any problems with the children interacting with [Mother] at the school?
>
> [A.] No. But, initially, when the children are dropped off, it is [] difficult between [foster mother] leaving and them warming up to [Mother].

*Id.* at 135.

With respect to Section 2511(b), our Supreme Court stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). Moreover, the Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In its Rule 1925(a) opinion, the trial court found as follows, which the testimony of Mr. Jimenez and Dianna Wallace, the social worker from Lutheran Church and Family Services, supports:

- 12 -

The record established that Children will not suffer any irreparable harm by terminating Mother's parental rights, and it is in the best interest of the Children to terminate Mother's parental rights. Mother and Children do not have a positive healthy bond. Mother and Children['s] bond is not a parent/child bond, but an aunt/nephew bond. In fact, after long periods without seeing each other, Children did not manifest any emotion when they saw their [m]other; they felt they were obligated to go to see their [m]other. DHS witnesses were credible. Conversely, there would be an irreparable harm if Children were removed from [f]oster [m]other. Children have been almost their entire lives with their foster [m]other and they are very close[ly] bonded with her. Foster mother has raised the Children and provides for [the] Children's daily basic needs, such as taking the Children to their medical appointments and providing comfort.

Trial Court Opinion, 12/7/15, at 11.

We specifically reject Mother's argument that the court abused its discretion in its credibility determinations regarding the testimony of Mr. Jimenez and Ms. Wallace as it related to the bond between the Children and Mother. The record supports the court's credibility findings in that Mr. Jimenez testified that he took the Children and picked them up from their unsupervised visit with Mother during the summer. N.T., 10/7/15, at 74-75. Likewise, Ms. Wallace testified that she dropped the Children off for a visit with Mother on one occasion where she "had to tell the children to go to Mom." *Id.* at 119.

Based on our review of the testimonial evidence, we conclude that involuntarily terminating Mother's parental rights would best serve the developmental, physical and emotional needs and welfare of the Children. Therefore, we discern no abuse of discretion by the court with respect to

Section 2511(b). Accordingly, we affirm the decrees pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/12/2016